**John QUIRK, on behalf of himself and all other employees of Baltimore County, Maryland similarly situated, et al.**

v.

**BALTIMORE COUNTY, MARYLAND.**

Civ. No. B–90–2983.

United States District Court,
D. Maryland.

Aug. 18, 1995.

Francis J. Collins and Andrew H. Kahn, Baltimore, MD, for plaintiffs.

Mary E. Pivec and Stanley Shapiro, Baltimore, MD, for defendant.

WALTER E. BLACK, Jr., Senior District Judge.

Presently pending before the Court are plaintiffs' Motion for Summary Judgment and defendant's Cross Motion for Summary Judgment. This lawsuit was filed by over 150 Emergency Medical Service Personnel (hereinafter "EMS personnel") of the Baltimore County Fire Department seeking compliance with the overtime provisions of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 207(a)(1). On a previous summary judgment motion, the Court determined that EMS personnel were not employees engaged in fire protection activity under the provisions of § 7(k) of the Act, 29 U.S.C. § 207(k), and, therefore, that the County must pay overtime after 40 hours rather than after 53 hours.

These cross motions for summary judgment address all remaining issues regarding overtime compensation. Plaintiffs contend that they are due overtime compensation for all hours worked in excess of forty hours per

week because they do not fall within the exemptions from overtime for professional, executive, or administrative employees. The County agrees that emergency medical technicians do not fall within any of the exemptions from the requirement; however, the County contends that captains are exempt as executives, and that paramedics and lieutenants with paramedic certification are exempt as professionals. Plaintiffs also contend that they are entitled to liquidated damages and a three-year statute of limitations, while defendants argue that liquidated damages are inappropriate and that the applicable statute of limitations is two years. Finally, the parties disagree over the appropriate method of calculating damages.

## I

Section 7(a)(1) of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1), requires that employees be paid time and a half for work over 40 hours per week. Section 13(a)(1) exempts from that requirement "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The burden of proving that an employee is exempt from the overtime requirement is on the employer. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974). Overtime exemptions are construed narrowly, against the employer. *Avery v. City of Talladega*, 24 F.3d 1337, 1340 (11th Cir.1994). This burden must be satisfied by clear and affirmative evidence. *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282 (4th Cir.1986); *Donovan v. United Video, Inc.*, 725 F.2d 577, 581 (10th Cir.1984).

As the County is claiming exemptions under both the executive and the professional exemptions, it is necessary to review the regulations pertaining to both of those exemptions. The regulations provide both "long" and "short" tests to determine whether an employee fits within the applicable exemption. *See* 29 C.F.R. §§ 541.1, 541.3. The long test for both exemptions applies to lower-paid employees, while the short test applies to employees making at least $250 per week. *Id.* Because both sides agree

that all plaintiffs earn at least $250 per week, the short test applies for both exemptions.

An employer is exempt from the requirement of paying overtime under the short test to a professional employee

who is compensated on a salary or fee basis at a rate of not less than $250 per week ... and whose primary duty consists of the performance either of work [requiring knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized instruction and study, as distinguished from a general academic education and from an apprenticeship and from training in the performance of routine mental, manual, or physical processes] ..., which includes work requiring the consistent exercise of discretion and judgment....

29 C.F.R. § 541.3(e). The short test for an executive exempts an employee

who is compensated on a salary basis at a rate of not less than $250 per week ... and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein....

29 C.F.R. § 541.1(f). As both tests for exemption require that an employee be paid on a salary basis, the Court will address that issue first.

### Salary Basis

The definition of a salaried employee, 29 C.F.R. § 541.118(a), states

An employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. This

policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work. The regulations then provide three exceptions to the rule that employees must be paid their full weekly salary to qualify for an exemption from overtime: (1) deductions are permissible when the employee is absent for a day or more for personal reasons; (2) deductions are permissible, in accordance with a bona fide plan, when the employee is absent for a day or more for sickness or disability; and (3) penalties for "infractions of safety rules of major significance" are permissible. 29 C.F.R. §§ 541.118(a)(2), (3) and (5). Deductions for absences due to jury duty, temporary military leave, or attendance as a witness are impermissible. 29 C.F.R. § 541.118(a)(4). Until September 18, 1992, deductions for partial day absences were impermissible for salaried employees. *See* 57 Fed.Reg. 37,666 (1992). However, at that time, due to concern that paying public sector employees for time they did not work was incompatible with public accountability, the Department of Labor issued a new regulation permitting deductions for absences of less than one work-day for public employees. 29 C.F.R. § 541.5d.

Here, the peculiarities of a collective bargaining agreement give the pay scheme attributes of both an hourly and a salary basis. Many courts have struggled with the difficult task of applying rules designed for the private sector to employees of public agencies. In fact, several courts and judges have ruled that part or all of the salary basis test is invalid as applied to the public sector. *See Service Employees International Union, Local 102 v. County of San Diego*, 35 F.3d 483 (9th Cir.1994), *as amended on denial of rehearing*, 60 F.3d 1346 (9th Cir.1995); *Hilbert v. District of Columbia*, 23 F.3d 429, 435 (D.C.Cir.1994) (Henderson, J. concurring in part, dissenting in part); *McGrath v. City of Philadelphia*, 864 F.Supp. 466, 486 (E.D.Pa. 1994); *Stewart v. City and County of San Francisco*, 834 F.Supp. 1233, 1238 (N.D.Cal. 1993). The County urges the Court to adopt this logic, or to rule that the interim version of § 541.5d, issued in 1991 but withdrawn by the Department of Labor, was in effect as of 1991.

The basis for the Ninth Circuit's ruling in *Service Employees* is as follows: The Department of Labor regulations formulating the salary test were promulgated in 1954, when the FLSA did not apply to public employers. In 1974, Congress amended the FLSA to cover public sector employees. Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 6, 88 Stat. 55, 59–63. However, in 1976, the Supreme Court ruled that the application of FLSA to public employees was unconstitutional. *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In 1985, the Supreme Court reversed itself in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and Congress once again amended the FLSA. Fair Labor Standards Amendments of 1985, Pub.L. No. 99– 150, 99 Stat. 787. In these amendments, Congress did not address the issue of whether the salary test should apply to public employees. Congress did state that "the bill extends minimum wage and overtime coverage to about 5 million *non-supervisory* employees in the public sector." H.R.Rep. No. 913, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 2811, 2837. The Ninth Circuit has interpreted that statement to mean that Congress intended public agencies to have the benefit of the executive and administrative exemptions. *Service Employees*, 35 F.3d at 487.

Thus, in 1986, public agencies were faced with the difficult task of complying with regulations that were enacted for private sector employers. In 1987, the Department of Labor recognized the problem and stated that it would not enforce that part of the salary basis test prohibiting deductions for absences of less than a day as to public employers. *See* 57 Fed.Reg. 37,668 (1992). Employees, on the other hand, were still permitted to file suit. *Id.* A wave of public sector employee lawsuits ensued and, in 1991, the Department of Labor issued an interim regulation altering part of the salary basis test for public employees, retroactive to April 16, 1986. 56 Fed.Reg. 45,824 (1991). In particular, the interim regulation permitted deductions for absences of less than one work-day and per-

mitted deductions caused by budget-required furloughs. *Id.* However, the interim regulation left all other aspects of the salary basis test unchanged as applied to public employers. *See* 57 Fed.Reg. 37,670 (1992). The interim rule was implemented without prior notice and comment because the Secretary of Labor found good cause to issue the rule without delay. *See id.* In several lawsuits, to which the Department of Labor was not a party, district courts ruled that the interim regulation was invalid for failure to comply with the notice and comment procedures of the Administrative Procedure Act. *See, e.g., Service Employees International Union, Local 102 v. County of San Diego,* 784 F.Supp. 1503 (S.D.Cal.1992), *rev'd,* 35 F.3d 483 (9th Cir.1994); *Alex v. California,* 1992 WL 146824, 1992 U.S.Dist. LEXIS 6795 (E.D.Cal. 1992). Although the Department of Labor disagreed, it withdrew the interim rule and instead issued the 1992 rule after following the Administrative Procedure Act. *See* 57 Fed.Reg. 37,672 (1992). Unlike the 1991 rule, the 1992 rule is not retroactive because the Department of Labor was concerned that a retroactive rule would be invalid under *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988), and its progeny, which held that a retroactive regulation is only valid if expressly authorized by Congress. *See* 57 Fed.Reg. 37,678 (1992).

The Court in *Service Employees* ruled that the Department of Labor's "interest in applying the new salary test retroactively is indicative of its firm conviction that its earlier iteration of the salary test conflicted with congressional intent." 35 F.3d at 489. The Ninth Circuit also relied on the fact that Congress intended that public agencies have the benefit of the executive and administrative exemptions from the overtime requirement, but that the salary basis test essentially deprived the public sector of these exemptions. *Id.* at 488–89. Therefore, the Court ruled that the salary basis test is invalid in its entirety as applied to the public sector, as conflicting with the intent of Congress and thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Id.* at 489. *See Stewart,* 834 F.Supp. at 1238.

Under the test set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* the Court must first look to see if the intent of Congress is clear on the question of whether the salary basis test should apply to the public sector. 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If it is clear, the Court must "reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843, n. 9, 104 S.Ct. at 2781, n. 9. Where, as here, congressional intent is not clear, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. Courts give substantial deference to the expertise of an agency charged with the administration of a statute. *See, e.g. Aluminum Co. of America v. Central Lincoln Peoples' Utility District,* 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984).

This Court relies on the fact that the expert agency assigned to implement the Fair Labor Standards Act examined the regulations and found them inconsistent with the statute:

> With regard to the public sector ... it is clear to the Department, after review of all of the comments, that certain aspects of the "salary basis" test for distinguishing exempt from nonexempt employees did not serve their intended purpose when applied to the public sector, as aspects of the "salary basis" requirement are unduly restrictive when applied in the public sector. In the Department's view, these aspects are not valid indicators of the *bona fides* of a claimed exemption under section 13(a)(1) in the public sector where every employee may theoretically be subject to potential docking for partial-day absences. State and local governments were thus being inappropriately deprived of the opportunity to apply the section 13(a)(1) exemption to their employees who would otherwise be properly exempt. For these reasons, the Department is of the view that public sector pay systems have to be analyzed differently from private sector pay systems.

57 Fed.Reg. 37,670 (1992). The Department of Labor also stated:

> It had become apparent to the Department ... that the previously existing rules and enforcement policy were inadequate for effectuating the statutory exemption in the public sector. The availability of the exemption to public employers was increasingly sharply limited, contrary to the expressed intent of Congress in the 1974 Amendments.

57 Fed.Reg. 37,671 (1992). In fact, the Department found the rule for partial-day absences ("docking rule") so inconsistent with the intent of Congress, that it attempted to promulgate a rule to make § 541.5d operate retroactively. *See* 56 Fed.Reg. 45,829 (1991). Only the limited power of an executive agency to issue retroactive regulations prevented the Department from effectively eliminating the docking rule. The Department of Labor itself has determined that its regulation was not based on a permissible construction of § 13(a). This Court, likewise, finds that because the docking rule was contrary to the expressed intent of Congress, the regulation is invalid as arbitrary, capricious, an abuse of discretion, and otherwise not in accord with the law.

■ However, as to the remainder of the salary basis test, the Court finds that the expert agency entrusted with interpreting the FLSA has examined the statute and regulations and determined that other aspects of the salary test could be applied to the public sector without unduly restricting the exemption. *See* 57 Fed.Reg. 37,673 (1992). While the salary basis test is clearly far from ideal and rather impracticable when applied to the public sector, there is no indication that it is not *a* permissible construction of the statute. The Court therefore defers to the Department of Labor's expertise and rules that the remainder of the salary basis test is not arbitrary and capricious.

In so doing, the Court declines to apply the ruling in *Service Employees* that the salary test was invalid in its entirety. This conclusion is flawed, in part because it is based on the finding that the Department of Labor's "non-enforcement policy covered the entire salary test, not just part of it; and essentially no valid salary test applicable to the public sector existed until the DOL finally conducted rule-making in 1991 and 1992." *Service Employees* at 1354 *as amended on denial of rehearing.* This finding is in error, since the enforcement policy issued by the Wage and Hour Administrator on January 9, 1987, was limited to the denial of "an exemption ... to an otherwise exempt public employee whose pay is reduced by deductions for absence(s) of less than a day for personal reasons, or because of illness or accident...." 57 Fed.Reg. 37668. Instead, this Court adopts the reasoning of Chief Judge Posner in *Mueller v. Reich,* 54 F.3d 438 (7th Cir.1995), namely, that after the promulgation of 29 C.F.R. § 541.5d effective September 18, 1992, the requirements in the regulations are valid, thereby limiting any invalidity solely to the docking rule in regard to absences of less than a day for personal reasons or because of illness or accident.

■ As most of the salary basis test is still applicable to plaintiffs, the Court will examine the pay schedules set forth in the union contract to determine whether plaintiffs are being compensated for the quality or quantity of work performed. Unfortunately, these pay schedules are of little help, as they specify both hourly and annual rates of pay. Article 10 of the union contract specifies an annual salary for each grade and step. (Plaintiffs' Summary Judgment Motion, Exhibit E at 15). From the annual salary, an hourly rate of pay is derived based on a 42–hour workweek. (Plaintiffs' Summary Judgment Motion, Exhibit L at 42). The annual salary is also divided into 26 equal payments, based on 84 hours of work. (Plaintiffs' Summary Judgment Motion, Exhibit L). EMS personnel have an average workweek of 42 hours based on a schedule of "a 10–hour day, 14–hour night shift on a 2–days/2–nights and 4–days off schedule." (Plaintiffs' Summary Judgment Motion, Exhibit E at 12). Plaintiffs are paid a base salary for 84 hours every two weeks, although in some pay periods they work less than 84 hours. In reality, under this pay arrangement, plaintiffs are scheduled to work 34 hours in some weeks, while in other weeks they work 38, 40, 42, or 48 hours.

The pay scheme appears to have some hourly aspects. For example, plaintiffs receive overtime based on an hourly rate of pay when they work beyond their normal shifts.[1] They receive out-of-class pay at an increased hourly rate if they substitute for another employee in a higher class. (Plaintiffs' Summary Judgment Motion, Exhibit E at 16). They receive an hourly shift differential for work at night. *Id.* at 18. However, overtime alone does not make plaintiffs hourly employees. The regulations provide that additional compensation does not alter the status of salaried employees. 29 C.F.R. § 541.118(b). The Fourth Circuit has interpreted this to mean that overtime does not defeat an otherwise authorized exemption for a salaried employee. *Hartman v. Arlington County,* 720 F.Supp. 1227 (E.D.Va.1989), *aff'd. on reasoning of lower court,* 903 F.2d 290 (4th Cir.1990).

The pay scheme here is similar to that in *Simmons v. City of Fort Worth, Texas,* 805 F.Supp. 419 (N.D.Tex.1992), in which the Court ruled that district and deputy fire chiefs were salaried employees under the Fair Labor Standards Act. Plaintiffs in that case worked particular shifts; they were on duty for twenty-four hours and off-duty for forty-eight hours. However, they received a bi-weekly pay check for eighty hours regardless of the time worked. Likewise, in *Masters v. City of Huntington,* 800 F.Supp. 363 (S.D.W.Va.1992), the Court ruled that deputy fire chiefs and captains were paid an annual salary. Their pay schedules set forth hourly rates of pay, but to arrive at the amount owed bi-weekly, the City divided their annual salaries by twenty-six, the number of pay periods in a year. They were paid the same base salary whatever they worked between 96 and 144 hours during the pay period. They were, however, paid for work beyond their regularly scheduled shifts on an hourly basis. Following Fourth Circuit precedent, the Court ruled that additional pay at an hourly rate does not defeat the exemption, because it is expressly permitted by the regulations. *Id.*

If the analysis were to end here, the Court would rule that plaintiffs are paid on a salary basis. They receive a minimum predetermined amount every two weeks, plus additional compensation in the form of overtime. They are paid for 42 hours of work each week, even if they only work 34 hours. All shift differentials work to plaintiffs' benefit; none reduce their salaries based on the quantity of work performed. However, the analysis does not end here, as the regulations specify other requirements for salaried employees.[2]

First, plaintiffs argue that their salaries are reduced, in violation of the regulations, when they are absent on temporary military leave. *See* 29 C.F.R. 541.118(a)(4). County

---

**1.** *See* Baltimore County Code Regulation 10.01(H) *Overtime Compensation for Employees in Positions on Pay Schedule V (IAFF):* "Such employees shall receive payment at one and one-half (1½) times their regular hourly rate when required to work on a previously scheduled day off or when required to work more than their regularly scheduled number of hours per week for the position."

**2.** Plaintiffs argue that their salaries are impermissibly docked for maternity leave and for appearance as witnesses in court in non-work related matters, and are also impermissibly deducted for the change from daylight savings time to standard time each fall. However, these arguments are without merit. The County has a bona fide plan which provides paid sickness and disability leave. (Defendant's Summary Judgment Motion, Exhibit 3 at Paragraph 3). Under the plan, maternity leave is treated like any other disability. Deductions for illness absences of more than a day are permissible under 29 C.F.R.

§ 541.118(a)(3). Likewise, the County provides paid court leave for jury duty, attendance as a witness in a case related to employment with the County, or attendance at a criminal trial as a victim or witness. (Defendant's Summary Judgment Motion, Exhibit 3 at Paragraph 8). The Fourth Circuit has ruled that an employer need not provide paid leave for an employee to engage in personal litigation. *Shockley v. City of Newport News,* 997 F.2d 18, 24 (4th Cir.1993).

As to the County's policy in regard to daylight savings time, the case upon which plaintiffs rely, *Thomas v. County of Fairfax,* 758 F.Supp. 353, 365–366 (E.D.Va.1991), concedes that a daylight savings policy is not dispositive. It is interesting to note that in *Thomas,* the court focused on the impact of change from standard time to daylight savings time each spring while plaintiffs in this case rely on the impact of the time change in the fall. The Court finds it hard to believe that such trivial details are dispositive of the issue before the Court and, accordingly, the impact of daylight savings time will not be addressed further.

policy provides 15 days of paid military leave. (Defendant's Summary Judgment Motion, Exhibit 3 at Paragraph 7). If an employee's military obligations exceed 15 days, he or she may use annual leave or compensatory time. However, if military obligations exceed accrued leave time, an employee must take unpaid leave. According to the County, during the Gulf War, three plaintiffs used annual vacation and holiday pay in addition to paid military leave. One of those three, Lieutenant Timothy Lowman, took unpaid leave between March 6, 1991, and April 1, 1991. The County argues that the prohibition on deductions for military leave is subject to the general rule stating that an employee need not be paid for any workweek in which he performs no work, and that no County employee was docked because of military duty in any week in which he worked. (*Id.*) Therefore, the Court must address the issue of whether potential deduction in pay for temporary military leave violates the salary regulations.

The Court has found no legal authority as to the meaning of "temporary military leave" either in the regulations or applicable case law. The County provides 15 days of paid military leave, and there is nothing in the record before the Court which establishes that military leave beyond 15 days is nevertheless temporary. The County's military leave policy is clearly reasonable to cover the usual situations involving an employee's annual summer National Guard duty or an emergency activation to meet the needs of some natural disaster or riot conditions. In this case, the use of military leave beyond the 15-day period was caused by the Gulf War. It would be a strained interpretation of the word "temporary" to apply it to mobilization of the Armed Forces to fight a full scale foreign war to a successful conclusion. Accordingly, the Court finds that the County has not violated 29 C.F.R. § 541.118(a)(4) by making any reductions in salary for tempo-

rary military leave. In any event, § 541.118(a) adopts the general rule "that an employee need not be paid for any workweek in which he performs no work." Consistent with this general rule, the County was not required to pay its employees on full-time military duty during their absence for that purpose. If the plaintiffs' theory in this regard rests on the possibility that returning service personnel might report for duty in the middle of a workweek, such an approach would trivialize the entire analysis and should not be a determining factor here.

Second, the Court must address plaintiffs' position that the County policy permitting the docking of pay for infractions other than infractions of safety rules of major significance also constitutes an impermissible deduction of salary.[3] Prior to August 30, 1993, Baltimore County Fire Department Special Regulation 6A authorized the suspension of an employee without pay for less than a week for infractions other than those of safety rules of major significance. The Fourth Circuit has ruled that "disciplinary reductions in pay, other than for violations of major safety rules, constitute reductions in pay based on the quantity and quality of an employee's work." *Shockley v. City of Newport News,* 997 F.2d 18, 24–25 (4th Cir.1993).

In order to comply with FLSA, on August 30, 1993, the Chief of the Fire Department issued a clarification that FLSA exempt employees would not be suspended for less than a week without pay.[4] Therefore, the only period at issue is the period before August 30, 1993. Significant to the Court's analysis is the fact that no plaintiff has ever been disciplined in such a manner. (Defendant's Summary Judgment Motion, Exhibit 3 at Paragraph 6, Exhibit 12). In this regard, Fourth Circuit authority is lacking since it is not clear whether any plaintiff in *Shockley* actually was docked for the minor rule in-

---

3. Unlike reductions for partial day absences, the 1992 amendment to the regulations did not alter the prohibition on deductions for minor infractions for public employees. 57 Fed.Reg. 37674 (1992) (Department of Labor found no sufficient basis for distinguishing between the public and private sectors in regard to deductions for disciplinary suspensions).

4. This amendment complies with the prohibition, because the County is permitted to withhold pay in any week in which an employee performs no work. 29 C.F.R. § 541.118(a).

fraction at issue, namely, failure to report absence from work.

Thus, the question is whether merely being subject to an impermissible reduction is sufficient to defeat the exemption. Several courts have held that if an employee's pay can theoretically be docked under the applicable pay scheme, that employee is "subject to deduction" within the meaning of § 541.118(a). *See, e.g., Kinney v. District of Columbia,* 994 F.2d 6, 11 (D.C.Cir.1993); *Abshire v. County of Kern,* 908 F.2d 483, 487 (9th Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 785, 112 L.Ed.2d 848 (1991); *D'Camera v. District of Columbia,* 693 F.Supp. 1208, 1212 (D.D.C.1988); *Banks v. City of North Little Rock,* 708 F.Supp. 1023, 1025 (E.D.Ark.1988); *Hawks v. City of Newport News,* 707 F.Supp. 212, 215 (E.D.Va. 1988); *Persons v. City of Gresham,* 704 F.Supp. 191, 194 (D.Or.1988); *Lacey v. Indiana State Police Department,* 810 F.Supp. 244 (S.D.Ind.1992). These courts have relied on the fact that the regulations specifically require that an employee be "subject to deduction" and not that an employee's pay actually be docked.

Other courts have refused to destroy an exemption merely because employees are subject to reductions in pay. *McDonnell v. City of Omaha,* 999 F.2d 293, 297 (8th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994); *Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta,* 920 F.2d 800, 805 (11th Cir.1991); *Harris v. District of Columbia,* 709 F.Supp. 238, 241 (D.D.C.1989). The court in *Harris* relied, in part, on a 1986 Department of Labor letter ruling which states:

> Where an occasional deduction that is not permitted by section 541.118 is made from the salary of an otherwise exempt employee, the exemption would be lost in that workweek when the deduction is made. However, if such deductions are regular and recurring, we would question whether the employee is actually paid "on a salary basis" and the exemption may be denied in all workweeks in which it is claimed, including those weeks when no deductions are made.

These courts have also held that if plaintiffs can show no evidence of an employee being impermissibly docked, the employer has met its burden of proving that employees' pay was not "subject to deduction."

The Court finds the reasoning of this line of cases more persuasive. The record is devoid of any evidence to prove that any plaintiff ever suffered a reduction of pay for infractions other than infractions of safety rules of major significance. Accordingly, the County has demonstrated that the plaintiffs' pay is not subject to reduction because of the quality or quantity of work. Even if there had been any inadvertent deductions, it would not result in loss of the exemption because the County properly corrected its policy through the "window of correction" allowed under 29 C.F.R. § 541.118(a)(6) which states:

> The effect of making a deduction which is not permitted under these interpretations will depend upon the facts of the particular case ... where a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future.

Since no employee was affected by the prior policy, there was no reason for the County to reimburse any employee for such a deduction, but the clarification issued by the Chief of the Fire Department on August 30, 1993, clearly constituted a promise to comply in the future. The County should not be denied the opportunity to utilize the "window of correction" under 29 C.F.R. § 541.118(a)(6) on the technicality that no deduction was ever made in this case. Under the circumstances, the window of correction under 29 C.F.R. § 541.118(a)(6) could have been properly utilized. *Hartman v. Arlington County,* 720 F.Supp. 1227 (E.D.Va.1989), *aff'd,* 903 F.2d 290 (4th Cir.1990); *International Association of Fire Fighters, Alexandria Local 2141 v. City of Alexandria,* 720 F.Supp. 1230 (E.D.Va.1989), *aff'd,* 912 F.2d 463 (4th Cir. 1990).

A contrary ruling here would mandate a ludicrous result that an employee would be

deemed to be paid "on a salary basis" if minor disciplinary matters resulted in a theoretical reduction in pay of one week or more, but would not be deemed to be paid "on a salary basis" if minor disciplinary matters resulted in a theoretical reduction in pay of less than one week.

Therefore, because County policy in regard to temporary military leave and discipline for infractions other than infractions of safety rules of major significance is permissible under the regulations, the Court finds that plaintiffs are not subject to reduction based on the quality or quantity of work performed and are therefore paid on a salary basis under the regulations.

### Professional Exemption

■ The County is asserting a professional exemption for all plaintiffs who are certified as paramedics. Apparently this is an issue of first impression, as neither party has cited any case addressing it. Plaintiffs argue that, in addition to not being paid on a salary basis, which the Court has resolved against them, they do not have enough education to be exempt as professionals and they do not exercise discretion. It is undisputed that all plaintiffs earn at least $250 per week.

The regulations regarding professionals are set forth at 29 C.F.R. § 541.300 and state "[t]he term 'professional' is not restricted to the traditional professions of law, medicine, and theology. It includes those professions which have a recognized status and which are based on the acquirement of professional knowledge through prolonged study." The regulations distinguish between learned professions and artistic professions. To be a learned profession requires "that the knowledge be of an advanced type. Thus, generally speaking, it must be knowledge which cannot be attained at the high school level." § 541.301(b). Furthermore,

The typical symbol of the professional training and the best prima facie evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced academic degree is a standard (if not universal) prerequisite. In the case of registered (or certified) medical technologists, successful comple-

tion of 3 academic years of preprofessional study in an accredited college or university plus a fourth year of professional course work in a school of medical technology ... will be recognized as a prolonged course of specialized intellectual instruction and study. Registered nurses have traditionally been recognized as professional employees by the Division in its enforcement of the act. Although, in some cases, the course of study has become shortened (but more concentrated), nurses who are registered by the appropriate State examining board will continue to be recognized as having met the requirement of § 541.3(a)(1) of the regulations.

29 C.F.R. § 541.301(e)(1). The regulations also require that the work of a professional must involve the consistent exercise of discretion and judgment. 29 C.F.R. 541.3(b).

As the regulations do not address the status of paramedics, the parties have looked for analogies in similar jobs covered by the regulations. The County relies on the fact that nurses have traditionally been exempt as professionals. 29 C.F.R. § 541.301(e)(1). Plaintiffs, on the other hand, compare paramedics to medical technologists, who are not professionals unless they have three years of study in college plus a fourth year of course work in a school of medical technology. *Id. See also, Brennan v. South Davis Community Hospital,* 538 F.2d 859 (10th Cir.1976) (holding that chief x-ray technician was not exempt as a professional).

The parties argue strenuously over the exact amount of training a paramedic needs, as opposed to the amount of training a nurse requires. Plaintiffs assert that they are required to have a high school education, plus training amounting to less than one year in college. The Baltimore County Office of Personnel Class Specifications states that a paramedic must have the following qualifications:

Graduation from a recognized high school, or possession of a high school equivalence certificate, or employment as a Firefighter in the Baltimore County Fire Department; plus possession of a current certificate, approved by the [Maryland State Board of Medical Examiners] *Board of Physician*

*Quality Assurance,* as a Cardiac Rescue Technician *or Emergency Medical Technician–Paramedic.*

(Plaintiffs' Summary Judgment Motion, Exhibit B). Defendants assert that plaintiffs need rigorous training to become a paramedic. However, in their description of necessary education, defendants include experience requirements. For example, to advance from Emergency Medical Technician–Ambulance ("EMT–A"), a non-paramedic classification, to Cardiac Rescue Technician ("CRT"), a paramedic classification, an employee must complete 150 emergency runs as an EMT–A. Such training is irrelevant to the question of how much college credit plaintiffs must earn.

Under County requirements, a CRT must complete a training course consisting of 120 hours of classroom instruction and 80 hours of supervised clinical training. (Defendant's Summary Judgment Motion, Exhibit 16, The Maryland Cardiac Rescue Technician Program Standards, and Exhibit 18, Affidavit of Ameen I. Ramzy, Chief Fire Surgeon for the Baltimore County Fire Department). In order to advance to the next level, Emergency Medical Technician–Paramedic ("EMT–P"), a CRT "customarily completes another 400 hours of training or the equivalent of an additional 42 college credits." (Defendant's Summary Judgment Motion, Exhibit 18). Neither party has presented any credible evidence regarding the amount of college credits required to become a nurse. Plaintiffs allege that it is more than 900 hours, but this is not supported by any admissible evidence.[5] Baltimore County disputes plaintiffs' figure but has provided no figure of its own.

The County also argues that paramedics are authorized to perform procedures, such as intubations, which a nurse is not authorized to do. In particular, the County relies on the fact that the Maryland Institute for Emergency Medical Services Systems is creating a "bridge program" so that a nurse can become certified as an EMT–P without going through the usual course of training. (Defendant's Reply, Exhibit B). The County views the proposed course as evidence for its position that paramedics have substantially more authority than nurses. The Court disagrees with this assessment. The fact that nurses may be able to take an abbreviated route to advanced life support certification is essentially irrelevant. It simply means that nurses have some of the training necessary for certification. As plaintiffs noted, there is no proposal for an abbreviated route from paramedic certification to becoming a nurse. The responsibilities of nurses and advanced life support personnel are simply different, although both operate in the same general field.

The parties also dispute whether a paramedic's duties involve the exercise of discretion. While paramedics are authorized to perform advanced medical procedures, plaintiffs argue that they are not allowed to exercise discretion. They are obliged to follow strict protocols and to respond only to a physician's orders. In fact, paramedics can be disciplined for taking action outside the protocols, even if the action was successful and medically appropriate. Plaintiffs provide the example of paramedic Rodney Rollins who was disciplined twice for successful, and in fact life-saving, treatment that was not in conformity with the protocols. (Plaintiffs' Reply, Exhibit 2).

Although paramedic training is indeed rigorous, the Court finds that paramedics do not have the necessary education to be considered professionals under the regulations. The regulations state that "an advanced academic degree is a standard (if not universal) prerequisite" to being considered a professional. 29 C.F.R. § 541.301(e)(1). In *Dybach v. Florida Department of Corrections,* 942 F.2d 1562, 1565 (11th Cir.1991), the Court held that a professional position "must call for a person who is in a learned profession with at least a college degree in a specialized type of learning," and further held that a generalized college degree was insufficient. *Id.*

Paramedics are not required to have any, much less an advanced, academic degree. Nor do they meet anything comparable to

**5.** The Court must disregard Exhibit 1 to Plaintiffs' Supplemental Memorandum in Support of Motion for Summary Judgment as it is not based on personal knowledge and would not be admissible under Rule 56(e) of the Federal Rules of Civil Procedure.

the medical technologist requirement of three years of college plus an additional year of course work in a school of medical technology. Whether becoming a nurse requires twice as many college hours as becoming a paramedic, or some other ratio, a nurse generally receives a college degree in nursing. A paramedic, on the other hand, receives advanced technical training. Furthermore, the Court finds that paramedics' work does not involve the consistent exercise of discretion. The experience of Rollins in being disciplined for violation of the protocols shows that paramedics are not permitted to exercise personal judgment, and clearly are not required to do so. Therefore, the Court finds that even though plaintiffs were paid on a salary basis, they are not exempt as professionals.

### Executive Exemption

■ The County is asserting an executive exemption for all plaintiffs with the rank of captain. The only plaintiffs in this category are John Bell and William Kraft. Under the short test, the County must show (1) that these captains are paid on a salary basis at a rate of not less than $250 per week; (2) that it is their primary duty to manage a recognized department or subdivision of the employer's enterprise; and (3) that they customarily and regularly direct the work of two or more other employees. 29 C.F.R. § 541.1(f). It is undisputed that Bell and Kraft are paid a salary well over $250 per week and that they direct the work of two or more other employees. The Court has already ruled that they are compensated on a salary basis. Accordingly, the Court must address the duty requirement of the regulations.

The Fourth Circuit has recently addressed the regulations interpreting the primary duty test:

Analysis of whether an employee's primary duty is management begins with determining which of the employee's duties involve management of a recognized department

or subdivision of the employer. As a 'rule of thumb,' the employee must devote more than fifty percent of his time to these duties. 29 C.F.R. § 541.103 (1992). Other pertinent factors, however, may indicate that management is the employee's primary duty.

Among the factors to be considered are: (1) the relative importance of the managerial duties as compared with other types of duties, (2) the frequency with which the employee exercises discretionary powers, (3) the employee's relative freedom from supervision, and (4) the relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

*Shockley*, 997 F.2d at 25–26.

Plaintiffs have submitted the affidavits of two lieutenants, rather than captains, to describe the duties of captains.[6] (Plaintiffs' Summary Judgment Motion, Exhibit C). According to the affidavits of EMS Lieutenants Charles Sturm and Rodney Rollins, captains perform some supervisory functions when on a medical call, but patient care is their primary concern, and accordingly, plaintiffs assert that they are working foremen rather than executives. In addition, plaintiffs claim that captains cannot hire, fire, or impose discipline, and they may not award bonuses or commendations; however, they can recommend discipline. Plaintiffs argue that the fire suppression captain, rather than the EMS captain, at each station manages EMS personnel when they are not on a medical call. Grievances go to the Battalion Chief, who is the lowest level employee not in the collective bargaining unit, rather than to the EMS captains; plaintiffs assert that the reason for this is that captains are members of the union.[7]

Defendants have submitted the affidavits of two EMS captains who are not plaintiffs in this case, Mark Francis Hubbard and David J. Murphy, to describe the duties of captains.

6. It is particularly noteworthy that Bell and Kraft have not submitted their own affidavits.

7. Plaintiffs also rely on the fact that Baltimore County law states that a person is not in manage-

ment if he is in a union. However, in interpreting the Fair Labor Standards Act, the Court must apply federal law, rather than state or local law.

(Defendant's Summary Judgment Motion, Exhibits 16, 17) (hereinafter Affidavit of Hubbard or Affidavit of Murphy). Murphy's uncontradicted testimony reveals that they spend more than 90 percent of their time on management, and less than 10 percent on direct patient care. In particular, the record reflects that they spend almost all of their time directing employees in the field, evaluating personnel performance, attending management meetings, performing administrative tasks in regard to management, handling sick leave, managing the distribution of equipment, and briefing subordinates regarding special orders. While plaintiffs are correct that under the collective bargaining agreement, union members cannot handle grievances, captains are authorized to remove subordinates from duty, stop providers from functioning due to unsatisfactory performance, write up disciplinary action forms, and direct action at emergency scenes to correct medical practice error or omissions. (Affidavit of Murphy). Furthermore, although Battalion Chiefs institute formal disciplinary charges, Murphy testified that captains' recommendations are always accepted. (Murphy Affidavit at 4C). The captains' paramount obligation is to direct personnel and equipment so that trauma victims receive immediate quality care. Therefore, under the "rule of thumb," their primary duty is management.

Even if captains did not spend 90 percent of their time on management activities, their primary duty would still be management. Applying the four factors discussed in *Shockley*, the Court finds that (1) although patient care is the ultimate objective of all EMS personnel, captains are the primary on-site managers for all other ranks of EMS personnel, and the primary function of the EMS shift commanders has always been management of personnel (Affidavit of Murphy); (2) captains must exercise significant managerial discretion in evaluating subordinates, manag-

ing equipment distribution, and directing employees in the field;[8] (3) the EMS captain is the highest ranking EMS employee at each fire station and therefore is relatively free from supervision, and (4) captains are paid 15 percent more than EMS Lieutenants, the next rank below captain, 20 percent more than EMS Field Coordinators, 30 percent more than Paramedics, and 35 percent more than EMTs (Affidavit of Hubbard). As the Court in *Keller v. City of Columbus*, 778 F.Supp. 1480, 1489 (S.D.Ind.1991) stated, "[t]hey are ranked and paid as officers precisely because of their managerial skills and position of responsibility." The Court finds that under the standard set forth in 29 C.F.R. § 541.103, as set forth more fully in *Shockley*, the primary duty of Bell and Kraft is clearly management.

As to the requirement that captains manage a recognized department or subdivision of the Fire Department, plaintiffs maintain that, at most, an EMS captain supervises one fire station. According to Hubbard's affidavit, Kraft and Bell became captains in 1990. Both worked standard shifts, supervising EMS Field Coordinators out of fire headquarters during the day, and out of a fire station at night. In 1991, their schedules were modified, so that they each work four ten-hour days at fire headquarters. They became the only shift commanders; Kraft was shift commander for the C and D shifts and Bell was shift commander for the A and B shifts. In 1992, two shift commanders were added and Kraft and Bell were relocated to fire stations.

According to the regulations, "the phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of men assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. § 541.104(a). A fire station is recognized as a unit with permanent status and function. *Masters*, 800 F.Supp. at 366;

---

8. In fact, the captains' responsibilities here are very similar to those of the officers found to be executives in *Shockley*, where the Fourth Circuit stated:

Their responsibilities extended not only to direct supervision of their subordinates, but also to the evaluation of the subordinates and to the management of both the people and equipment assigned to their units. These responsibilities required the exercise of considerable discretion, discretion that typically is not given to a working foreman.

997 F.2d at 27.

*Hartman*, 720 F.Supp. at 1229. Similarly, the EMS unit located at a fire station is also a unit with permanent status and function. Thus, the Court finds that the captains' primary duty is management, and they do manage a recognized department or subdivision of the Fire Department. Accordingly, they are exempt from the applicable provisions of the Fair Labor Standards Act.

### Good Faith and Liquidated Damages

■■■■ Because the Court has ruled that all but two of the plaintiffs are entitled to overtime compensation, it must next address the issue of liquidated damages. The parties disagree over whether defendants have put forth sufficient evidence of good faith to escape the otherwise mandatory liquidated damages. Section 216(b) of the Fair Labor Standards Act provides that an employer "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The Portal–to–Portal Act, 29 U.S.C. § 260, provides a limited defense to § 216:

> if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had a reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in § 216 of this title.

The limited defense requires the employer to show both that it acted in good faith and that it had reasonable grounds to believe it was not violating the Act. *See Horan v. King County, Div. of Emergency Medical Services*, 740 F.Supp. 1471, 1481 (W.D.Wash. 1990) (finding good faith and reasonable grounds); *Dybach*, 942 F.2d at 1567 (holding that employer failed to demonstrate reasonable grounds). "The good faith requirement mandates the employer have 'an honest intention to ascertain and follow the dictates of the Act.' " *Renfro v. City of Emporia*, 948

F.2d 1529, 1540 (10th Cir.1991), *cert. dismissed*, 503 U.S. 915, 112 S.Ct. 1310, 117 L.Ed.2d 510 (1992) (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir.1982)). Good faith requires some investigation of potential liability. *Horan*, 740 F.Supp. at 1481. An employer cannot "simply remain blissfully ignorant of FLSA requirements." *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir.1984).

The Court finds that Baltimore County has met its burden of showing good faith and a reasonable grounds for believing it was not violating the Fair Labor Standards Act. After the *Garcia* decision, the County examined its personnel to determine which employees would be affected by the ruling. (Defendant's Summary Judgment Motion, Exhibit 21). The County consulted legal counsel and personnel specialists in neighboring jurisdictions and concluded that all employees with the rank of paramedic and above met the requirements for exemption. Despite the expenditure of substantial judicial resources nationally over the past decade, the resolution of the legal issues involved in this case is still in doubt to this very day.

Plaintiffs did not raise the issue of the 7(k) exemption until 1990, after the decision in *Horan* was issued, holding that emergency personnel were not subject to the 7(k) exemption. Based on the absence of Fourth Circuit precedent, the presence of a contrary ruling, and the historic integration of fire and emergency medical services, the County disagreed with plaintiffs' legal position. Because the state of the law was, and remains, so unsettled, the County clearly had reasonable grounds for believing that the 7(k) exemption applied to EMS personnel. The absence of precedent is also evidence of good faith. *Bond v. City of Jackson*, 727 F.Supp. 1516, 1519 (S.D.Miss.1989), *rev'd on other grounds*, 939 F.2d 285 (5th Cir.1991).

### Statute of Limitations

■■■■ In order to determine the appropriate statute of limitations, the Court must address the issue of whether the County's violation of the FLSA was willful. If the County's violation was willful, a three-year statute of limitations applies; if it was not

willful, a two-year statute of limitations applies. 29 U.S.C. § 255(a). In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988), the Supreme Court noted that "willful" is considered synonymous with "deliberate" and "intentional." Willfulness requires that an employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* Negligent conduct is not willful. *Id.* In addition, good faith is a defense to willfulness, *Burgess v. Catawba County*, 805 F.Supp. 341 (W.D.N.C.1992), "as good faith is necessarily inconsistent with knowing or reckless disregard." *Id.* at 351. *See also Dole v. Haulaway Inc.*, 723 F.Supp. 274, 288 (D.N.J.1989), *aff'd*, 914 F.2d 242 (3d Cir.1990), *cert. denied*, 499 U.S. 936, 111 S.Ct. 1388, 113 L.Ed.2d 445 (1991). For the reasons stated in the discussion of liquidated damages, the Court finds that Baltimore County was not willful, so the proper statute of limitations is two years.

### *Calculation of Damages*

■ The parties differ over the proper method of calculating damages. Plaintiffs argue that they should be paid half time for hours 41 and 42 in any week, and time and a half for hours worked over 42. The County, on the other hand, maintains that the Court should take into account the weeks where plaintiffs worked less than 40 hours to reduce damages. In essence, the County wants to recalculate plaintiffs' hourly rate for each week, depending on the number of hours each employee worked. Otherwise, plaintiffs get the benefit of being paid too much for those weeks that they worked 40 hours or less. To arrive at the "regular rate" for each employee, the County divided the total compensation for each week by the number of hours actually worked when the employee actually worked in excess of 40 hours. Then, assuming that the employee had been paid straight time for all hours worked, the County divided the "regular rate" by two to get the half time rate, and multiplied the half time rate by the number of hours worked in excess of 40. (Defendant's Summary Judgment Motion, Exhibit 4 at Paragraph 2).

The County relies on 29 U.S.C. § 207(f), which allows an employer and employee to contract for irregular hours of work, either individually or in a collective bargaining agreement, and on the fluctuating workweek rule implementing § 207(f), set forth at 29 C.F.R. § 778.114(a), which provides:

An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week.

The Court notes two distinct problems with the County's method of calculating damages. First, the § 207(f) exemption is specifically applicable only if the employee's duties necessitate irregular hours of work. 29 U.S.C. § 207(f). Here, the duties do not necessitate irregular hours of work. Absent the collective bargaining agreement, EMS personnel could easily be assigned a regular, repeating weekly shift. Second, and most important, there is simply no evidence that the parties agreed to a different hourly rate

depending on the number of hours worked each week. Article 10 of the collective bargaining agreement reveals that the parties contemplated an annual salary. (Plaintiffs' Summary Judgment Motion, Exhibit E). The pay schedule clearly shows an annual salary and an hourly rate for each grade of employee.[9] The County's approach involves a hypothetical hourly rate that has no basis in the collective bargaining agreement. Thus, the Court adopts plaintiffs' method of calculating damages, and awards half time for hours 41 and 42, and time and a half for hours worked over 42.

### Prejudgment Interest

■■■■■ In the absence of liquidated damages, plaintiffs argue that prejudgment interest should be awarded. "In the Fourth Circuit, the prevailing standard appears to be that the decision to award prejudgment interest is a discretionary one for the trial court, which should consider the equities of the particular case." *Thomas v. County of Fairfax,* 758 F.Supp. 353, 368 (E.D.Va.1991), *aff'd without op.,* 16 F.3d 408, 1994 WL 8202 (4th Cir.1994); citing *Dole v. Shenandoah Baptist Church,* 899 F.2d 1389, 1401 (4th Cir.1990), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990). The purpose of prejudgment interest is to make plaintiff whole. *See Cline v. Roadway Express, Inc.,* 689 F.2d 481 (4th Cir.1982).

The Fourth Circuit has not ruled on whether a finding of good faith on defendant's part precludes the award of prejudgment interest. However, in this district, courts have ruled that "an employer's good faith is not a sufficient reason for denial of pre-judgment interest." *Marshall v. Board of Education,* 470 F.Supp. 517, 519 (D.Md. 1979), *aff'd* 618 F.2d 101 (4th Cir.1980); *see also Marshall v. Gerwill, Inc.,* 495 F.Supp. 744, 755 (D.Md.1980).

On balance, the Court finds that the equities in this case militate against the award of prejudgment interest. Plaintiffs have been paid in many weeks for more hours than they have worked, due to the collective bargaining agreement. Now they will receive overtime for those weeks where they worked more than forty hours, without losing anything for those weeks in which they worked less than forty hours, and this inequity will continue indefinitely so long as the basic terms of the collective bargaining agreement remain unchanged. Therefore, the Court finds that prejudgment interest is not required in order to make plaintiffs whole for wages withheld.

For all of the foregoing reasons, the Court will grant in part and deny in part plaintiff's Motion for Summary Judgment. Likewise, the Court will grant in part and deny in part defendant's Cross Motion for Summary Judgment. A formal order will be entered in conformity with this opinion.

### ORDER

In accordance with the opinion filed today in the above-captioned case, IT IS, this 18th day of August, 1995, by the United States District Court for the District of Maryland,

ORDERED:

(1) That plaintiffs' Motion for Summary Judgment (Paper 210) BE, and the same hereby IS, GRANTED IN PART and DENIED IN PART, as follows:

(a) The motion is granted in regard to overtime compensation for all plaintiffs other than John Bell and William Kraft;

(b) The motion is granted in regard to plaintiffs' method of calculating damages, namely, half time pay for hours 41 and 42 in any week and time and a half for all hours over 42; and

(c) The motion is denied in all other respects;

(2) That defendant's Cross Motion for Summary Judgment (Paper 211) BE, and the same hereby IS, GRANTED IN PART and DENIED IN PART, as follows:

---

9. The record reveals that two hourly rates of pay are listed on the County pay schedule for different types of employees. One hourly rate is for a County employee who works a 40–hour workweek, while the other hourly rate applies to uniformed employees, including plaintiffs, who work an average of 42 hours per week. (Plaintiffs' Summary Judgment Motion, Exhibit L at 41).

(a) The motion is granted in regard to overtime compensation for plaintiffs John Bell and William Kraft;

(b) The motion is granted in regard to plaintiffs' claim for liquidated damages;

(c) The motion is granted in regard to the application of the two-year statute of limitations;

(d) The motion is granted in regard to plaintiffs' claim for prejudgment interest; and

(e) The motion is denied in all other respects.