Argued and submitted March 7, 2000, decision of Court of Appeals and judgment of circuit court affirmed April 25, 2002

Gary McLEAN,
*Petitioner on Review,*

*v.*

BUCK MEDICAL SERVICES, INC.,
dba American Medical Response Northwest, Inc.,
and A. A. Ambulance Service of Portland, Inc.,
dba American Medical Response Northwest, Inc.,
*Respondents on Review,*

*and*

MULTNOMAH COUNTY,
*Respondent on Review.*

(CC 9601-00413; CA A96826; SC S46151)

45 P3d 120

W. Eugene Hallman, Pendleton, argued the cause and filed the briefs for petitioner on review. With him on the briefs was Mark D. Griffin, of Griffin McCandlish, Portland.

Stephen F. Crew, of Ramis Crew Corrigan & Bachrach LLP, Portland, argued the cause and filed the briefs for respondents on review Buck Medical Services, Inc., and A. A. Ambulance Service of Portland. With him on the briefs was T. Chad Plaster, Portland.

No appearance for respondent on review Multnomah County.

Margaret S. Olney, of Smith, Gamson, Diamond & Olney, Portland, filed a brief for *amicus curiae* AFSCME Council 75.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, and Riggs, Justices.**

GILLETTE, J.

Durham, J., concurred and filed an opinion in which Riggs, J., joined.

---

** Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case; Kulongoski, J., resigned June 14, 2001, and did not participate in the decision of this case; De Muniz and Balmer, JJ., did not participate in the consideration or decision of this case.

## GILLETTE, J.

This is a class action by employees of Buck Medical Services, Inc. (Buck), the exclusive provider of ambulance services within certain parts of Clackamas and Multnomah counties, seeking overtime pay from their employer under two provisions of the public contract laws. Plaintiff, the class representative, brought the action on the theory that Buck's contracts with Multnomah and Clackamas counties are "public contracts," and that public contracting laws—specifically, ORS 279.316 (1997) and ORS 279.334 (1997) (set out below)[1]—require Buck, as a public contractor, to pay overtime wages for any hours that its employees work on weekends, holidays, or in excess of eight hours in a given day. The trial court rejected that theory and granted summary judgment for Buck. The Court of Appeals affirmed, holding that, regardless of whether the contracts at issue are public contracts, they are exempt from the statutory overtime pay provisions in ORS 279.316 (1997) and ORS 279.334 (1997) because they are "personal service contracts" within the meaning of those statutes. *McLean v. Buck Medical Services, Inc.*, 157 Or App 563, 569-79, 971 P2d 462 (1998). For the reasons that follow, we affirm.

Because the trial court granted Buck's motion for summary judgment, we view the record in the light most favorable to plaintiff—the party opposing summary judgment—and draw all reasonable inferences in that party's favor. *See Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997) (stating rule). In July 1991, Clackamas County adopted an Ambulance Service Plan to ensure efficient provision of ambulance service. The plan provided for four "ambulance service areas" (ASAs) within the county and further provided that, for each ASA, all emergency ("9-1-1") requests for ambulance transportation calls would be referred to a single ambulance service provider, which would respond to the calls and charge the users (rather than the county) for its services. The exclusive provider for each ASA

---

[1] Throughout this opinion, we refer to the statutes as they appeared at the time that the present case came before this court. As we shall explain later, the pertinent wording of one of the statutes, ORS 279.316, recently has been amended. The other statutes have not changed in any way that is relevant.

would be selected through a competitive request-for-proposal (RFP) process.

In September 1993, Clackamas County issued an RFP for its largest ASA. The RFP set certain minimum credential and performance standards, and indicated that the successful bidder would be selected on the basis of its credentials, response-time commitments, level of clinical sophistication, fiscal strength, equipment management and maintenance, key personnel, employee wage and benefit structure, proposed costs and charges to users, and other factors. Buck responded to the RFP, submitting a proposal that included, along with other materials pertaining to wages and benefits, a copy of Buck's collective bargaining agreement with its employees. The collective bargaining agreement provides for overtime pay for holidays and all hours worked in excess of 40 hours in any week, but not for weekend work or hours in excess of eight hours on a particular day.

The county ultimately selected Buck as the sole ambulance provider within the ASA and entered into an agreement to that effect. The agreement provided, among other things, that, "at a minimum," Buck would adhere to the wage and benefit package described in its proposal. It further provided, in a section labeled "Standard Provisions," that "[t]he provisions of Oregon public contracting law, ORS 279.310 through ORS 279.320 are incorporated herein by this reference."[2]

In 1994, Multnomah County adopted an Ambulance Service Plan that was similar to the Clackamas County plan. Like Clackamas County, Multnomah County decided to select an exclusive ambulance service provider for its single ASA through an RFP process, and to base its selection on a variety of factors including credentials, performance commitments, employee wage and benefit structure, and cost of the service to users. Buck responded to Multnomah County's RFP with a proposal that was similar to its Clackamas County proposal and that incorporated a similar wage and benefit proposal. Buck was selected as the exclusive provider

---

[2] The statutes have been amended several times since, but no amendment affects our analysis in this case.

for the Multnomah County ASA and entered into an agreement with the county that required it to adhere to the wages and benefits described in its proposal. Unlike the Clackamas County agreement, the Multnomah County agreement does not include a provision incorporating ORS 279.310 to ORS 279.320 by reference.

Plaintiff, a paramedic who works for Buck under both the Clackamas and Multnomah county agreements, filed this action against Buck in 1996, alleging violations of ORS 279.316(1)(a) (1997) and ORS 279.334(1)(a) (1997), and of provisions of the contracts between Buck and Clackamas and Multnomah counties. Later, the court certified the case as a class action and designated plaintiff as class representative.[3] Buck moved for summary judgment, arguing that the contracts were not subject to the public contracting statutes and that, in any event, they were "contracts for personal services" and exempt from the overtime pay requirements in ORS 279.316(1)(a) (1997) and ORS 279.334(1)(a) and (6) (1997).[4]

---

[3] The class is composed of

"any person who worked at any time during the period July 18, 1994 to the present for defendants and performed services pursuant to the contract between defendants and Clackamas County dated July 14, 1994 * * * and any persons who worked at any time during the period September 1, 1995, to the present for defendants and performed services pursuant to the contract between defendants and Multnomah County dated July 20, 1995."

[4] ORS 279.316(1)(a) (1997) provides, in part:

"(1)(a) Every public contract shall also contain a condition that no person shall be employed for more than 10 hours in any one day, or 40 hours in any one week, except in cases of necessity, emergency, or where the public policy absolutely requires it, and in such cases, *except in cases of contracts for personal services as defined in ORS 279.051,* the employee shall be paid at least time and a half pay:

"(A) For all overtime in excess of eight hours a day or 40 hours in any one week when the work week is five consecutive days, Monday through Friday; or

"(B) For all overtime in excess of 10 hours a day or 40 hours in any one week when the work week is four consecutive days, Monday through Friday; and

"(C) For all work performed on Saturday and on any legal holiday specified in ORS 279.334.

"* * * * *

"(2) In the case of contracts for personal services as defined in ORS 279.051, the contract shall contain a provision that the employee shall be paid at least time and a half for all overtime worked in excess of 40 hours * * *."

(Emphasis added.) ORS 279.334 (1997) provides, in part:

The trial court accepted those arguments and granted the motion.

On plaintiff's appeal, the Court of Appeals affirmed. *McLean v. Buck Medical Services, Inc.*, 157 Or App at 565. The court held that, regardless of the general applicability of the public contracting statutes, the contracts in question are "contracts for personal services" and exempt from the overtime pay requirements of ORS 279.316 and ORS 279.334. *Id.* at 574. In so holding, the Court of Appeals concluded that both ambulance service contracts fell within categories of contracts that had been designated as personal services contracts by the relevant county contract review board. *Id.* at 572-73. It also opined that, in making those designations, those county boards had not exceeded the authority delegated to them by a related public contracting statute, ORS 279.051(2), to designate classes of contracts as personal services contracts. *McLean*, 157 Or App at 576-77.

Plaintiff challenges the decision of the Court of Appeals on a number of grounds. Plaintiff argues, first, that

---

"(1)(a) In all cases where labor is employed by the state, county, school district, municipality, municipal contractor, or subdivision, through a contractor, no person shall be required or permitted to labor more than 10 hours in any one day, or 40 hours in any one week, except in cases of necessity, emergency, or where the public policy absolutely requires it, in which event, the person or persons so employed for excessive hours shall receive at least time and a half pay:

"(A) For all overtime in excess of eight hours a day or 40 hours in any one week when the work week is five consecutive days, Monday through Friday; or

"(B) For all overtime in excess of 10 hours a day or 40 hours in any one week when the work week is four consecutive days, Monday through Friday; and

"(C) For all work performed on Saturday and on * * * legal holidays:

"* * * * *

"(6) *This section shall not apply to contracts for personal services as defined in ORS 279.051*, provided that persons employed under such contracts shall receive at least time and a half pay for work performed on the legal holidays specified in subsection (1)(a)(c)(ii) to (vii) of this section and for all overtime worked in excess of 40 hours in any one week, except for individuals under these contracts who are excluded under ORS 653.010 to 653.261 or under 29 U.S.C sections 201 to 209 from receiving overtime."

(Emphasis added.)

the Court of Appeals misinterpreted ORS 279.051, constru-ing it to allow local contract review boards virtually unfet-tered discretion in designating contracts as personal services contracts when, in fact, that discretion is quite limited. Plain-tiff contends that local boards may designate contracts as personal services contracts only if those contracts fit into the category of contracts that are for the services of a particular individual who possesses a high degree of expertise or profes-sional, artistic, or management discretion that is necessary for the task. Plaintiff contends that the Buck contracts are not in that category, because they pertain to the work of a large number of employees, none of whom perform work that requires a professional level of expertise or discretion.

■    Plaintiff's argument presents a question of statutory construction, which we carry out under the analytical frame-work set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). In accordance with *PGE's* instruction, we begin by examining the text and context of the relevant statutes to ascertain the legislature's intent. *Id.* at 610-11.

As noted, both ORS 279.316(1)(a) (1997) and ORS 279.334(6) (1997) exempt from the overtime pay require-ments "contracts for personal services *as defined in ORS 279.051*."[5] (Emphasis added.) It follows that the first place to look in analyzing the statutes' meaning is ORS 279.051 (1997). ORS 279.051 (1997) provides, in part:

"(1)    Except as provided in ORS 279.712, public agen-cies may enter into contracts for personal services. * * * Each public agency authorized to enter into personal serv-ice contracts shall create procedures for the screening and selection of persons to perform personal services.

---

[5] We construe ORS 279.316(1)(a), ORS 279.334(6), and ORS 279.051, as they appeared at the time that this case first came to this court. We note, however, that the 2001 Legislature altered the wording that is at the focus of our analysis in one of the statutes at issue. Specifically, in a general statute that purported to "correct * * * erroneous material," the 2001 Legislature replaced the phrase "as *defined* in ORS 279.051" in ORS 279.316(1)(a) with "as *described* in ORS 279.051." Or Laws 2001, ch 104, § 91. The legislature did not, at that time, alter the parallel wording in ORS 279.334(6). The change in ORS 279.316(1)(a) is not relevant to the present case, and we express no opinion as to its import or effect.

"(2)   The Director of the Oregon Department of Administrative Services [DAS] or a local contract review board by ordinance, resolution, administrative rule or other regulation may designate certain service contracts or classes of service contracts as personal service contracts."

Although ORS 279.051 actually does not fulfill the expectation created in ORS 279.316(1)(a) (1997) and ORS 279.334(6) (1997) that it will *define* "contracts for personal services," the statute does authorize the director of DAS or local public contract review boards to "designate" certain contracts and classes of contracts as personal services contracts. One way—indeed, we think the most plausible way—to construe the phrase "as defined in ORS 279.051" in ORS 279.316(1)(a) (1997) and ORS 279.334(6) (1997) would be to read it as referring to those contracts that the director of DAS or local contract review agencies, under the authority granted to them by ORS 279.051(2) (1997), have designated as personal service contracts. That interpretation assumes that ORS 279.051(2) (1997) delegates authority to the director of DAS or local contract review boards to define "contract for personal services" for purposes of the public contracts within their respective purviews.

It also is arguable, however, that, regardless of contrary suggestion in ORS 279.316(1)(a) (1997) and ORS 279.334(6) (1997), ORS 279.051(2) (1997) does not confer authority on DAS or local contract review boards to define "contract for personal services." That, essentially, is the position that plaintiff takes.[6] Plaintiff contends the term "contract for personal service" has a fixed meaning in ORS 279.051(2) (1997), and that the only choice that the statute delegates to local contract review boards is *whether to designate* a particular service contract or class of service contracts that fall within that legislatively intended meaning as "personal," so that the exceptions at ORS 279.316(a)(1) (1997) and ORS 279.334(6) (1997) will apply.

---

[6] Plaintiff does *not* argue that, if the statute *does* confer such authority on the direction of DAS or local contract review boards, the grant is without standards and, thus, impermissible.

Inherent in plaintiff's argument is the assumption that the statutes either express or assume a particular, limited definition of the concept of a "personal services contract." As previously noted, plaintiff contends that the statutes *do* express such a choice, which plaintiff characterizes as a choice to make the "personal services contract" exception from the overtime provisions in ORS 279.316(1)(a) (1997) and ORS 279.334(6) (1997) only applicable to contracts with a single individual for services that require a high degree of expertise or professional, artistic, or management discretion. Plaintiff argues that that intention is evident from the legislature's use of the phrase "contract for personal services" itself and from the statutory context in which that phrase is used.

Plaintiff first points to the term "personal" in the phrase "contract for personal service" and to the fact that ORS 279.051(1) (1997) requires public agencies to "create procedures for the screening and selection of *persons* to perform personal services." (Emphasis added.) Relying on the common usage of the terms "person" and "personal," plaintiff contends that term "contract for personal service" clearly pertains to contracts for the services of a particular individual.

We are not convinced that the use of those terms is dispositive. At least in legal parlance, the term "person" may include business and other nonhuman entities, often made up of a large number of persons, that are recognized as having certain of the rights and duties of a human being.[7] Moreover, other provisions in ORS chapter 279 appear to contemplate that at least some personal services contracts will require services by companies or other business entities.[8] Ultimately, we are unpersuaded that those words in the

---

[7] *Black's Law Dictionary*, 1162 (7th ed 1999) defines "person" as, among other things, "[a]n entity (such as a corporation) that is recognized by law as having the rights and duties of a human being."

[8] For example, ORS 279.057(3)(d) provides that certain contracts for consulting services are personal service contracts and further provides that screening and selection procedures for such consulting services may include consideration of "each candidate's * * * [o]wnership status and employment practices regarding women, minorities and emerging small businesses or historically underutilized businesses."

statute, read in context, demonstrate that the legislature expressed the choice that plaintiff asserts.

Plaintiff also relies on the fact that, in a related statute, ORS 279.712(1), the term "personal services" is used in connection with two typically *professional* services—architectural and engineering services.[9] Plaintiff reasons from that connection that the phrase "personal services" in ORS 279.316(1)(a) (1997) and ORS 279.334(6) (1997) also must refer to the same professional services, or services like them, that require a high degree of professional, managerial, or artistic discretion.

Again, we are unpersuaded. Plaintiff is relying on the principle of *"ejusdem generis," see, e.g., King Estate Winery, Inc. v. Dept. of Rev.,* 329 Or 414, 424, 988 P2d 369 (1999) (stating and using principle), but this is not a case in which the reference to "architectural [and] engineering * * * services" in ORS 279.712(1) is sufficient to define fully the scope of the term "personal services contract." The phrase in which those terms appear is too open-ended to aid our construction of the distinct terminology of ORS 279.051.

In addition to considering plaintiff's arguments, we have examined independently the text and context of ORS 279.051 (1997), ORS 279.316 (1997), and ORS 279.334 (1997), including the textual history of each statute. We have found nothing in any of those sources that sheds light on the issue that we confront here. Both readings of the cross-references to ORS 279.051 (1997) in ORS 279.316(1)(a) (1997) and ORS 279.334(6) (1997) remain plausible. We turn to legislative history—the second level of analysis—in our attempt to determine whether the legislature intended to place the primary responsibility for defining "personal services" with the director of DAS and local contract review boards. *See PGE,* 317 Or at 611-12 (demonstrating methodology).

---

[9] ORS 279.712(1) provides:

"The Oregon Department of Administrative Services shall purchase or otherwise provide for the acquisition or furnishing of all supplies, materials, equipment and services, including *architectural, engineering and other personal services,* required by state agencies * * *."

(Emphasis added.)

Before 1979, the only references to "personal services contracts" in the public contracting statutes appeared in the section that pertained to bidding and purchasing. ORS 279.051 (1977) authorized public agencies to enter into "personal services contracts" and provided that the state public contracting board could impose screening and selection procedures on any state agency. ORS 279.011(1) (1977) defined "public contract" to include purchases, leases, or sales by a public agency "other than agreements which are exclusively for *personal service*."[10] (Emphasis added.)

In 1979, the legislature adopted a second section of ORS 279.051, authorizing the director of DAS and local contract review boards to "designate certain contracts and classes of contracts as personal services contracts." Or Laws 1979, ch 196, § 2. The provision was adopted in the context of concerns about the requirements of the bidding and purchasing sections of the public contracting statutes and, in particular, about the implications of a then-recent Court of Appeals decision, *Photo-Art v. Hunter*, 42 Or App 207, 600 P2d 471 (1979). *Photo-Art* held that a state agency's contract with a filmmaking company for the production and ultimate purchase of three films was a "public contract" within the meaning of ORS 279.011(1) as it then appeared[11] and that the agency should have awarded it to the lowest qualified bidder. *Id.* at 211-13. The Court of Appeals read literally the statutory exemption for agreements, which are "exclusively" for personal services, and concluded that the film contract was outside that exemption, because the contract covered the purchase of the films as well as personal services required to create them. *Id.*

Shortly thereafter, the Attorney General sponsored Senate Bill 232 (1979), which sought to delete the term

---

[10] We note that this court considers earlier versions of the statute at issue as context, not legislative history. *Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994). In this case, however, we provide the earlier statutory information as background to our discussion of the contents of the legislative record.

[11] At that time, ORS 279.011(1) defined "public contract" to mean

"* * * any purchase, lease or sale by a public agency of personal property, public improvements or services *other than agreements which are exclusively for personal services*."

(Emphasis added.)

"exclusively" from ORS 272.011(1) and to add a provision that would allow the state Public Contract Review Board or local contract review boards to designate contracts and classes of contracts as personal service contracts.[12] During legislative discussions, a committee administrator described the bill as "allow[ing] more flexibility in determining what is a services contract and what is a personal services contract."[13] One witness, Jack Sollis of the Oregon Department of Transportation, stated that the bill "grant[s] * * * authority to the Public Contract Review Board to make a very definitive distinction of what contracts are or are not personal service contracts."[14] Although it is clear from those discussions that some of the bill's proponents thought of the "personal service contract" bidding exemption primarily in terms of professional services,[15] others spoke of personal services contracts in more flexible terms—*i.e.*, as contracts in which the particular capabilities of the party performing the

---

[12] The 1979 bill and enactment granted that authority to a state Public Contract Review Board or local contract review boards. *See* Or Laws 1979, ch 196, § 2 (granting authority to "board"), § (1) (defining "board" to include "the Public Contract Review Board or local contract review board of a city or county as provided for in ORS 279.055"). A later amendment to ORS 279.051(2) extended the same authority to the Director of the Department of Administrative Services (then the Department of General Services). Or Laws 1983, ch 690, § 13. Finally, in 1997, the legislature amended ORS 279.051(2) to refer only to "the Director of the Oregon Department of Administrative Services or a local contract review board." Or Laws 1997, ch 802, § 1.

[13] Testimony of Isaac Regenstreif, Committee Administrator, Senate Committee on Local Government, SB 232, January 22, 1979, Tape 2, Side 1.

[14] Testimony of Jack Sollis, Senate Committee on Local Government, SB 232, January 22, 1979, Exhibit B, p 3.

[15] For example, one proponent stated:

"In dealing with this problem, we feel that the Public Contract Review Board can, by administrative rule, provide what types of personal service contracts are to be let [through] the competitive [bidding] process and which personal service contracts will be let by the process of advertising for proposals, interviewing the parties that have submitted proposals and determining from the interviews which proposed contractor can do the best job even though the price they have proposed may not be the lowest price offered. The reasoning behind this is that [in] securing the service of professionals such as attorneys, physicians, architects, engineers, surveyors, accountants, auditors, real estate appraisers and other professionals, it is the duty of the state to secure the individual who will perform the best job and not necessarily the individual or company who will work for the cheapest price."

Testimony of Jack Sollis, Senate Committee on Local Government, SB 232, January 22, 1979, Exhibit B, pp 1-2.

contract are a more important consideration than the overall contract cost. *See, e.g.*, Testimony of Noel Klein, on behalf of the League of Oregon Cities, House Committee on Intergovernmental Affairs, SB 232, April 25, 1979, Tape 14, Side 1 (illustrating proposition). It also is clear that, as we have explained, the common purpose was to avoid the *Photo-Art* problem.

The committees that considered the bill understood that it contained a very broad delegation and that it relied heavily on the discretion of the state or local public contract review boards. One discussion in the Senate Local Government Committee is illustrative. When asked whether the state Public Contract Review Board could draft a meaningful rule distinguishing personal services contracts, Assistant Attorney General Don Seymour, counsel for the Board, answered:

> A: "I think that a meaningful rule could be adopted [but] it's not going to be too easy. I would suggest an amendment to the law and we wouldn't have to worry about an administrative rule. One possible way of going about it would be to put in a provision that would restrict this personal service contract that would involve more than just personal service to one where the end product would be unique. I think this would solve a lot of the problems and I think one of the worries that this committee might have is that the Board might adopt a rule where it would open the floodgates [to] everything being a personal services contract and not be subject to competitive bids and a restriction like that might ease some of the minds of the committee. The example that is bothering me * * * is a contract to paint this room. I think it's a services contract but its not a personal services contract but you could adopt a rule that would make this a personal service contract and that would not be subject to competitive bid. However, in the ordinary sense, the painting of this room, the end product would not be unique."

> Q: "In your opinion though, some kind of defensible rule could be drawn?"

> A: "Yes, I believe that a rule could be drawn that would allow this kind of contract to be a personal services contract not out for competitive bid and still protect the public in cases where the public would expect the matter to be put out for competitive bid."

Tape Recording, Senate Committee on Local Government, SB 232, January 22, 1979, Tape 2, Side 1. Shortly thereafter, an unidentified committee member commented:

> "It appears to me that the rulemaking authority that we would be giving is of massive significance to the state of Oregon and we should probably carefully consider whether we want to remove the people's attorney general from the [Public Contracting Review] Board?"

*Id.* The committee chairman, Senator Frank Roberts, answered: "Yes, we've increased its responsibilities tremendously." *Id.*

We think that the foregoing history shows that, in enacting ORS 279.051(2) (1997), the legislature understood that it was conferring broad authority on contract review agencies to designate contracts as "personal services contracts." The history indicates, for example, that the legislature contemplated that contract review boards would be able to designate entire contracts as "personal services contracts" for purposes of ORS chapter 279, even if only part of the work that the contract covered traditionally would be considered "personal services." The history also shows that the legislators did not choose to attempt to limit the delegation in the statute, even when it was suggested that the boards might use that delegation to make designations that were counterintuitive. In sum, the history reinforces what we had concluded was the most plausible way to read the statutory text: The legislature intended to authorize the boards to define for themselves which contracts or classes of contracts were "personal service contracts" and exempted from the competitive bidding process.

Plaintiff suggests, however, that, in this inquiry, the proper focus is on the history of ORS 279.316 and ORS 279.334, the two wage and hour statutes that are at issue. Plaintiff notes that the people enacted the wage and hour protections contained in those provisions by initiative in 1912,[16] and that the initiative sought to protect laborers from

---

[16] Or Laws 1913, ch 1, note.

long hours and low wages that were, in the view of the initiative sponsors, detrimental both to labor and to the public welfare. Plaintiff argues that the court must read ORS 279.316 and ORS 279.334 broadly to effectuate that purpose and that the Court of Appeals' reading, which expands the authority of local contract review boards to declare exceptions to those statutes, does just the opposite.

In so arguing, plaintiff chooses to ignore the fact that we are dealing here with *amendments* to ORS 279.316 and ORS 279.334. However expansive the voters' intent may have been when the people adopted those wage and hour protections in 1912, the fact remains that the 1989 Legislature exempted certain contracts, *i.e.*, "contracts for personal services as defined in ORS 279.051," from those protections. If the meaning and scope of that exemption is not clear from its text and context, then the next step is to examine the legislative history of the amendment. Accordingly, we turn to the legislative history of the 1989 amendments to ORS 279.316 and ORS 279.334.

At the time of the 1989 amendments, as now, ORS chapter 279 contained two definitions of the term "public contract." The first, by its express terms, applies to the term "public contract" "as used in ORS 279.011 to 279.063." It provides: " 'Public contract' means any purchase, lease or sale by a public agency of personal property, public improvements or services *other than agreements which are for personal services*." ORS 279.011(4) (1987) (emphasis added). The other definition, which appeared at ORS 279.310(1), applied to the term "[w]hen used in ORS 279.310 to 279.320." Under that definition, " 'public contract' means a contract made with the state, county, school district, municipality, municipal corporation or subdivision thereof."[17]

It appears that the amendments at issue were conceived after the state Attorney General issued an opinion that suggested that the latter definition applied to ORS 279.316 and ORS 279.334. *See* Minutes, Senate Committee

---

[17] As above, *see* 334 Or at 28 n 10, we provide this material as background to our discussion of the contents of the legislative record.

on Labor, SB 40, April 3, 1989, pp 2-4. According to discussions of the proposed amendments in the Senate Committee on Labor, the Department of General Services had been conducting its affairs as if only the first definition, which excludes personal services contracts, applied. The amendments were needed to "clarify" that "personal contracts" that the department and local governments had been treating as exempt from the wages and hours limitations of ORS 279.316 and ORS 279.334 were, in fact, exempt. *See also* Testimony of Jon Yunker, Administrator, Budget and Management Division, Executive Department, Senate Committee on Labor, SB 40, April 3, 1989, Exhibit A (to same effect). Some legislators objected to exempting personal services contracts from wage and hour protections altogether, and proposed amendments that would provide some wage and hour protections to persons working under personal services contracts. *See* Minutes, Senate Committee on Labor, SB 40, April 28, 1989, p 4 (comments of Annette Talbott, Committee Administrator). The amendments at issue resulted from those discussions: They exempt "personal services contracts as defined in ORS 279.051" from the requirements in ORS 279.316 and ORS 279.334 that workers be paid time-and-a-half for weekend hours and hours in excess of eight hours in a day, but require overtime pay for hours in excess of 40 in any week. Or Laws 1989, ch 572, §§ 1-2.

Interestingly, much of the testimony and discussion respecting the amendments centered around avoiding the high cost of extending the overtime pay requirement for weekends and hours in excess of an eight hour day to human services and "purchase of care" contracts. Witness Colleen Hoss, speaking to the Senate Committee on Labor on behalf of local governments, emphasized that many community service projects require providers to be present seven days a week and 24 hours a day. Minutes, Senator Committee on Labor, SB 40, April 3, 1989, p 3. Witness Jon Yunker of the Executive Department, focused on "purchase of care" contracts in his testimony. He noted that extending the wage and hour protections of ORS 279.316 and ORS 279.334 to personal services contracts would increase the cost of business significantly for governments. Testimony of Jon Yunker,

Senate Committee on Labor, SB 40, April 3, 1989, Exhibit A.
He particularly noted that

> "the Department of Human Resources will have the
> greatest impact because it has over 90 percent of all per-
> sonal services contracts.
>
> "* * * * *
>
> "Most of the additional expenses in applying the defini-
> tion will be for labor costs for purchase of care, *e.g.*, nursing
> homes, foster care, health services, residential group
> homes, emergency and shelter care facilities, residential
> psychiatric care facilities. Overtime must be paid to persons
> working split shifts or flexible time. It adds 104 days per
> year which must be compensated at time and a half
> (Saturdays and Sundays). Purchase of care operates on a
> seven-day workweek, 24-hours per day schedule, not a five-
> day workweek, eight-hours per day schedule. The employes
> of the purchase of care contractors are presently paid for
> any overtime or holidays worked. However, if a worker's
> five-day workweek begins on Saturday and ends on
> Wednesday, the worker is not paid overtime for working
> eight hours on a Saturday or a Sunday, unless the day is a
> holiday—like Christmas."

*Id.*

The significance of that history is twofold. First, it
shows that the 1989 Legislature understood the amendment
as codifying the then-current understanding and practice of
state and local public contracting agencies, which all along
had treated the contracts that they classified as personal
services contracts as exempt from the wage and hour guar-
antees at ORS 279.316 and ORS 279.334. Second, it shows
that the legislature understood that, by excepting "contracts
for personal services as defined in ORS 279.051" from those
wage and hour guarantees, it was excepting a broad array of
human services contracts that required around-the-clock
labor, including "purchase of care" contracts for nursing
homes, foster care, health services, and residential group
homes. Such contracts clearly do not fall within the narrow
definition of "personal service" contract that plaintiff pro-
poses; however, they are very much like the ambulance serv-
ice contracts at issue in this case, which require 24-hour

availability and involve administering emergency health care.

■        Ultimately, the foregoing legislative history, combined with the legislative history of ORS 279.051(2), satisfies us that (1) the 1979 Legislature did not attach a particular meaning to the term "contracts for personal services" when it adopted ORS 279.051(2), but, instead, invested public contracting agencies with broad discretion to designate contracts and classes of contracts as personal services contracts when cost is secondary to other considerations; (2) in excepting "contracts for personal services as defined in ORS 279.051," the 1989 Legislature extended that same broad discretion to the wage and hour arena; and (3) the 1989 Legislature endorsed the notion that a wide range of human services contracts that do not necessarily involve professional, artistic, or managerial discretion still might be exempted, under the rubric of personal services contracts, from the wage and hour guarantees in ORS 279.316(1)(a) and ORS 279.334(1)(a).[18]

■        Neither do we find any basis for concluding that a local contract review board abuses the discretion that ORS 279.051(2) extends to it by designating ambulance service contracts like those that are at issue here as personal services contracts. A board reasonably could conclude, in choosing an exclusive ambulance service provider, that obtaining the services of the most capable provider is more important than cost and that a competitive bidding process would be inappropriate. Plaintiff may think it inappropriate that that decision also should place the contract at issue within an exemption to the wages and hours laws, but that is the choice that the legislature made.

■        Plaintiff's second objection to the decision of the Court of Appeals is a corollary to his first: He argues that it is

---

[18] Plaintiff also suggests that the definition of "personal services contract" that DAS adopted after the passage of ORS 279.051(2) is controlling. *See* OAR 125-20-130 (limiting personal services contracts to those that call for "specialized skills, knowledge and resources in the application of highly technical or scientific expertise, or the exercise of professional, artistic or management discretion or judgment"). It is not. ORS 279.051(2) provides separate authority to local boards to designate personal services contracts. Those boards are not bound in that endeavor by a DAS choice to limit personal services contracts to contracts involving professional, artistic, or other similar skills.

impermissible to eliminate the wage and hour protections of individual employees who do not perform personal services in any sense of the word by "bundling" those employees together with others under "personal services" contracts. However, it appears from the wording of ORS 279.316 (1997) and ORS 279.334 (1997) that that is what the legislature intended. On their faces, ORS 279.316(1)(a) (1997) and ORS 279.334(6) (1997) exempt *"contracts* for personal services as defined in ORS 279.051" from the overtime pay provisions on which plaintiff relies. (Emphasis added.) There is nothing in either statute that suggests that individual employees working *under* personal services contracts might be treated differently, depending on whether they themselves performed services that might be deemed personal services.

In plaintiff's third challenge to the decision of the Court of Appeals, he argues that the trial court erred in granting Buck's motion for summary judgment, because issues of material fact remained as to whether Clackamas and Multnomah counties intended to designate the contracts at issue as personal services contracts. We understand this argument to have two components.[19] First, plaintiff appears to argue that the contracts at issue do not fall within the classes of contracts that have been designated as personal services contracts by the relevant local contract review board. In that regard, plaintiff suggests that only a rule that designates "ambulance services" as a category of personal services contract would suffice. Second, plaintiff appears to argue that, regardless of the sweep of the definition in the local public contracting rules, there is a question of fact whether the counties intended that these *specific* contracts be personal services contracts and exempt from the overtime pay requirements that are at issue. Plaintiff contends that the absence of any express reference to personal services in the contracts, the fact that an unsuccessful bidder on the Multnomah County RFP did not understand that the RFP was about a contract for personal services, and other evidence all raise a question of fact in that regard.

---

[19] Because plaintiff's arguments to this court on this point are brief and somewhat general, we read them in light of the more expansive treatment in plaintiff's brief to the Court of Appeals.

We deal first with the latter of those two arguments, because we do not believe that it actually is presented by this case. Buck never has argued that the counties intended to or did designate the *specific* contracts as personal services contracts. Instead, Buck has argued that the contracts are within *classes* of contracts that have been designated as personal services contracts by the relevant county authorities. Buck's case thus stands or falls on a legal question, *viz.*, the scope and applicability of the county rules. If the contracts fall within the scope of the definitions that the relevant county boards adopted, then the contracts are personal services contracts for purposes of ORS chapter 279.

The foregoing leaves us with plaintiff's arguments that pertain to the scope of the Multnomah and Clackamas county rules. We begin by setting out the relevant rules. The Clackamas County rule, which was adopted in January 1994, provides, in part:

> "The following are personal service contracts:
>
> "(a) Contracts for services performed as an independent contractor in a professional capacity, including but not limited to the services of an accountant; attorney; architectural or land use planning consultant; physician or dentist; registered professional engineer; appraiser or surveyor; passenger aircraft pilot; aerial photographer; timber cruiser; data processing consultant or broadcaster.
>
> "* * * * *
>
> "(f) Contracts for human services provided by independent contractors in the areas of aging and senior services, mental health services, health services, social and emergency services, child care services, and temporary shelter services."

Clackamas County Local Contract Review Board Rule 110-092.

The Multnomah County rule does not use the term "personal services contract." Instead, it provides for a category of contracts that it denominates as "professional services contracts," which the county may enter into using an RFP (rather than competitive bidding) process. The rule provides:

"The following are professional services contracts:

"(1) Contracts for services performed as an independent contractor in a professional capacity, including but not limited to, the services of an accountant; attorney; architect; architectural or land use planning consultant; physician or dentist; registered professional engineer; appraiser or surveyor; passenger aircraft pilot; aerial photographer; timber cruiser; data processing consultant or broadcaster.

"* * * * *

"(5) Contracts for educational, human custodial care services and other human services."

Multnomah County Public Contract Review Board Administrative Rule 10.092.

As noted, plaintiff contends that the absence of specific reference to "ambulance services" in the two rules is significant. Plaintiff notes, first, that both counties adopted ordinances defining "personal services contract" within a few months before the execution of the relevant contract with Buck. Plaintiff contends that, "[g]iven the contemporaneous timing of these contracts and ordinances, it is inconceivable that the [c]ounties would not have designated 'ambulance services' within [the two ordinances] if they intended ambulance services to be included within the designation of personal services contracts."

Plaintiff's argument assumes that the county boards would choose to designate categories of contracts with some level of specificity and would not rely on the broad categories that appear at Clackamas County Rule 110-092(f) ("health services" and "social and emergency services") and Multnomah County Rule 10.092(f) ("educational services, human custodial care services and other human services"). Plaintiff argues that, in fact, "[t]hese generalized terms do not identify emergency ambulance service contracts as personal service contracts," because "[n]early every contract with a county in which services are provided fit within [those loose classifications]." However, we are satisfied that the counties could have relied on those broad categories in the circumstances that plaintiff has described. We equally are satisfied that, regardless of how contemporaneous the executions of the

Buck contracts were with the promulgation of the rules, neither law nor logic dictated that the counties necessarily would have added a specific reference to ambulance services, had they meant to include them in the broad sweep of those rules.

Plaintiff also argues that the terms "health services" and "emergency services" in the Clackamas County rule and "educational, human custodial care services and other human services" in the Multnomah County rule do not encompass these contracts. Plaintiff notes, in that regard, that ambulance services are not classified as health, emergency, or human services in the United States Census Bureau's 1987 *Standard Industrial Classification Manual* (SICM) but, instead, are classified as transportation services. *Id.* at § 4119, pp 267-68 (classifying "ambulance service, road" under category 4119, "Local Passenger Transportation, Not Elsewhere Classified"). Plaintiff also relies on the fact that the counties that drafted the contracts labeled them contracts for "ambulance service," not "personal services."

■ We do not agree with plaintiff's suggestions that the counties are bound by the classification choices used in the SICM or any other classification system, or that the counties must label their contracts with the same terminology that they use in their rules.[20] We are persuaded, instead, that the classes described in the rules must be construed in the ordinary way, using the same method that we use in construing a statute. *See Abu-Adas v. Employment Dept.*, 325 Or 480, 485, 940 P2d 518 (1997) (court uses same method in interpreting agency rules that it does in interpreting statute). We begin with text and context of the rules, and assign to the terms of common usage used in the rules their "plain, natural and ordinary" meaning. *Id.*; *see also PGE* at 610-12 (prescribing same methodology for statutory constructions).

■ Employing that method, we have no difficulty in concluding that the ambulance service provided under the contracts falls within two of the categories named in the

---

[20] ORS 279.051(2) does not impose any requirements of that sort. It provides only that local boards shall make their designations "by ordinance, resolution, administrative rule, or other regulation."

Clackamas County rule, *viz.*, "emergency" and "health" services. Ambulance service commonly responds to emergencies; ambulance crews commonly provide health care to sick or injured persons.

The applicability of the Multnomah County rule is less obvious, but we believe that the ultimate conclusion is the same. With respect to that rule, Buck argues, and the Court of Appeals held, that the contracts at issue fall within the broad category of "educational, human custodial care services and other human services." The Court of Appeals held, specifically, that ambulance service is a type of custodial care and that, in any event, it falls under the catchall phrase "other human services."

■  We agree with the Court of Appeals' assessment that ambulance service qualifies as an "other human service[ ]." The term "human services" is somewhat vague and, if it stood alone, might be read to encompass only social welfare services or the like. However, the fact that Multnomah County associated it with more specific but also very disparate terms in this context ("educational services" and "custodial care services") persuades us that the term was intended in a more comprehensive sense, *i.e.*, as one encompassing any service that operates directly on human beings. Ambulance service falls into that category.

■  Moreover, and even if ambulance service did not fit into that particular section of the ordinance, there is still another section of the Multnomah County ordinance that is relevant, *viz.*, the section that identifies and describes "professional" services. Plaintiff always has argued that the services provided under the contracts at issue are not "professional" services. Citing *Quirk v. Baltimore County, MD.*, 895 F Supp 773 (D Md 1995), plaintiff argues that the services provided by emergency medical technicians (EMTs) such as those on Buck's ambulances are not professional services, because EMTs do not have a sufficiently high level of education, or exercise enough discretion in their work, to be considered professionals.

The *Quirk* case interpreted federal Department of Labor regulations that pertained to the enforcement of the Fair Labor Standards Act. The regulations expressly designated as the touchstones of a profession a high level of formal

education and a high degree of discretion. Here, however, we are interpreting the term "professional service" as it is used in Multnomah County's rule. The fact that the Multnomah County rule does not require the same level of formal education and discretion as the Department of Labor rule in *Quirk* is shown by the express inclusion of appraisers, passenger aircraft pilots, aerial photographers, timber cruisers, and the like in the category of services that are deemed to be "performed * * * in a professional capacity." The inclusion of those and other occupations in the definition of "profession" makes clear that the Multnomah County rule uses the term "professional service" in the sense of the broad definition found in *Marx v. Hartford Accident and Indemnity Company*, 183 Neb 12, 157 NW2d 870 (1968). That definition, which this court utilized in *Multnomah Co. v. Oregon Auto Ins. Co.*, 256 Or 24, 28, 470 P2d 147 (1970), provides:

> "The act or service must be such as exacts the use or application of special learning or attainment of some kind. The term 'professional' * * * means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor or skill and the labor or skill involved is predominantly mental or intellectual rather than physical or manual."

*Marx*, 157 NW 2d at 871-72.

Emergency medical technicians (EMTs), and ambulance service in general, fall within the foregoing meaning of "professional." The record on summary judgment establishes that EMTs are required to have special learning—two years of training—that provides them not only with the physical skills to perform medical procedures but also with the intellectual skill to recognize symptoms and to make split-second decisions. Other courts have concluded that those factors bring ambulance services into the broad meaning of professional service described in *Marx*,[21] and we agree with their assessments.

---

[21] *See, e.g., Curtis Ambulance v. Shawnee Cty. Bd. of Cty. Comr's*, 811 F2d 1371 (10th Cir 1987) (for purposes of county public contract bidding requirements, contract for ambulance service was personal services contract exempt from bidding requirement).

Ultimately, we are persuaded that both contracts are within categories of contracts that have been designated by the appropriate authority as personal services contracts. Consequently, they also are personal services contracts for the purposes of ORS chapter 279 and, specifically, for the purposes of the exemptions from the overtime pay requirements in ORS 279.316(1)(a) (1997) and ORS 279.334(1)(a) (1997).

█ With respect to those exemptions, plaintiff asserts one more argument that only pertains to the Clackamas County contract. Plaintiff argues that, even if the Clackamas County contract otherwise would be exempt under those statutes, it is subject to the overtime pay provisions contained therein because the contract expressly incorporates those provisions by reference. The Clackamas County contract provides, in part:

> "The provisions of the Oregon public contracting law, ORS 279.310 through 279.320 are incorporated herein by this reference."

Buck responds, and we agree, that the foregoing contractual provision is not helpful to plaintiff. Although it is true that one of the statutory provisions upon which plaintiff relies, ORS 279.316(1)(a), is a statute that is cross-referenced in the contract, it also is true that the same cross-referenced provision contains the *exemption* for personal services contracts that we have determined to be applicable to this contract.

Plaintiff suggests that it is nonsensical to read the noted provision as incorporating both the cross-referenced wage and hour requirements *and* the statutory exemptions to those requirements. However, the exemption does not extend to *all* the cross-referenced wage and hour requirements, and parties to the contract reasonably could intend to adopt some of the referenced statutory requirements (for example, that they pay overtime for over 40 hours in one week, ORS 279.316(2), timely pay for labor, ORS 279.312(1), and make appropriate payments to the Industrial Accident Fund, ORS 279.312(2), but not the ones from which the contract statutorily is exempt.

For the reasons discussed, we hold that the responsible counties were entitled to treat the contracts at issue as personal services contracts within the meaning of ORS chapter 279. The contracts are exempt from the overtime pay provisions upon which plaintiff relies. Because we have so concluded, we do not consider Buck's alternative argument that the contracts are not "public contracts" and that ORS chapter 279 generally is inapplicable in this case.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**DURHAM, J.,** concurring.

The majority concludes that the legislature intended to authorize parties to a public contract to avoid responsibility for compliance with Oregon's wage and hour laws by obtaining, from the Multnomah County and Clackamas County contract review boards, designations that the ambulance service contracts in question are "personal service contracts" under ORS 279.051. That is a correct answer to the issue that plaintiff poses. I write separately to make it clear that the majority opinion, in addressing the legislature's intended *scope* of the delegated authority of local contract review boards, does not decide any issue regarding the *validity* of that delegation.

Statutory competitive bidding requirements regarding public contracts generally foster the public's interest in obtaining goods and services from qualified suppliers at the lowest available cost. The legislature allows local governments to subordinate that public interest by contracting pursuant to an exemption from competitive bidding requirements (for example, when a local government entity pays extraordinary lawyer fees to protect it against a risk of liability). One exemption, discussed below, concerns contracts for "personal services."

ORS 279.316(1)(a) and ORS 279.334, which the majority sets out in its footnote 3 of its opinion, state certain wage and hour requirements that pertain to public contracts. However, each statute expressly provides that it is inapplicable to "contracts for personal services as defined in ORS 279.051 * * *." ORS 279.316(1)(a); ORS 279.334 (6).

As the majority correctly observes, ORS 279.051 fails to define "contracts for personal services," thus contradicting the terms of ORS 279.316(1)(a) and ORS 279.334. Instead, ORS 279.051(2) expressly authorizes a local contract review board to "designate certain service contracts or classes of service contracts as personal service contracts." The majority concludes that the legislature intended that that delegation would authorize the local contract review boards in Multnomah and Clackamas Counties to designate the particular ambulance service contracts involved here as "personal service contracts." That conclusion about the legislature's intention involves no inquiry into the question whether the delegation satisfies legal requirements for a lawful delegation.

In *Warren v. Marion County*, 222 Or 307, 313, 353 P2d 257 (1960), this court addressed a claim by a building contractor that a building code ordinance in Marion County and the statutory enabling act that authorized the ordinance were unconstitutional and void. The plaintiff argued, among other things, that the statute purported to delegate authority to promulgate building regulations, but lacked any definite standards for the regulations. According to the plaintiff, the enabling statute attempted to delegate legislative power in violation of the legislature's constitutional lawmaking authority set out in the Oregon Constitution, Article IV, section 1. 222 Or at 311.

The court agreed that the legislature had stated the statutory standards for the regulation of building construction in general terms, but concluded that the generality of the standards that accompanied the legislative delegation did not create a constitutional defect. The court stated:

"There is no constitutional requirement that all delegation of legislative power must be accompanied by a statement of standards circumscribing its exercise. It is true that a contrary view has frequently been expressed in the adjudicated cases, particularly the earlier ones, but the position taken in such cases is not defensible. It is now apparent that the requirement of expressed standards has, in most instances, been little more than a judicial fetish for legislative language, the recitation of which provides no additional safeguards to persons affected by the exercise of the

delegated authority. 1 Davis, Administrative Law Treatise, §§ 2.04, 2.05; Forkosch, Administrative Law, § 84. Thus, we have learned that it is of little or no significance in the administration of a delegated power that the statute which generated it stated the permissible limits of its exercise in terms of such abstractions as 'public convenience, interest or necessity' or 'unjust or unreasonable,' or 'for the public health, safety, and morals' and similar phrases accepted as satisfying the standards requirement. 1 Davis, Administrative Law Treatise, §§ 2.03-2.05; Forkosch, Administrative Law, §§ 83, 84.

"As pointed out in Davis on Administrative Law, the important consideration is not whether the statute delegating the power expresses *standards*, but whether the procedure established for the exercise of the power furnishes adequate *safeguards* to those who are affected by the administrative action. 1 Davis, Administrative Law Treatise, §§ 2.10, 2.15, 7.20. See also: *Peninsula Corporation v. United States*, 60 F Supp 174 (D.C. Cir 1945); *Heath v. Mayor and City Council of Baltimore*, 187 Md 296, 49 A2d 799 (1946).

"In testing the statute for the adequacy of such safeguards it is important to consider the character of administrative action which the statute authorizes. The statute here authorizes the establishment of building codes, including the adoption by reference of published codes such as the Uniform Building Code which the defendant adopted in modified form. Such codes are in themselves a statement of specific standards for the construction of buildings. The administrative official charged with the duty of enforcing a building code ordinance is called upon to decide whether the specifications set out in the code have been met in the construction of a particular building. His action can, therefore, be tested against the specific description of adequate construction set out in the building code. The statute then requires that the county set up appeal procedures so that persons dissatisfied with the building inspector's action in ruling upon the suitability of materials or construction may have that action reviewed by a separate administrative body. What further safeguards are needed to protect persons subjected to regulation under such a code?

"We believe that the appeals procedure required by ORS 215.108(2) provided a sufficient safeguard to persons wishing to contest administrative action in the enforcement of

the code. Plaintiff has not mentioned the standards which he thinks would satisfy the requirement for an adequate statute. We doubt that any standards which he could suggest for inclusion in the statute would make any clearer the scope of the delegated power or contribute materially to the protection of a citizen against unwarranted administrative action. We hold that ORS 215.108 constitutes a valid delegation of legislative power."

222 Or at 313-15 (emphasis in original).

Under *Warren*, the key to determining whether a statute—here, ORS 279.051(2)—establishes a permissible delegation of legislative authority is to examine whether the legislative scheme furnishes adequate safeguards to protect those who are affected by the resulting administrative action, such as plaintiff. When examined in that light, ORS 279.051(2) appears problematic.

The lack of any statutory definition or standard by which the public or a court might identify a "personal service contract" is no small oversight. Because no statute supplies any limitation to that term, the legislature's scheme appears to approve the designation of *any* public contract as a personal service contract. No statute requires that a contract designated under ORS 279.051(2) actually *be* a personal service contract.

ORS 279.051(1) requires pertinent public agencies to "create procedures for the screening and selection of persons to perform personal services." Multnomah County and Clackamas County may or may not have promulgated the procedures that that statute requires. In examining those or other procedures, if they exist, under *Warren*, the question is not simply whether locally adopted procedures guide the public entity in selecting those persons who shall perform personal services. Rather, the question is whether the pertinent statutes furnish adequate safeguards to adversely affected persons, such as plaintiff, to protect against "unwarranted administrative action." 222 Or at 315.

*Warren* decided that the enabling statute considered in that case did incorporate adequate safeguards and, therefore, that the statute was a "valid delegation of legislative power." *Id.* The majority does not address or decide that

question in regard to the legislative delegation involved here. In view of the scope of the legal issues that this case raises, I agree with that approach.

I concur.

Riggs, J., joins in this concurrence.